*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 14-CV-308 & 14-CV-309

EXPEDIA, INC., ET AL., APPELLANTS/CROSS-APPELLEES,

v.

DISTRICT OF COLUMBIA, APPELLEE/CROSS-APPELLANT.

Appeals from the Superior Court
of the District of Columbia
(CAB-2117-11)

(Hon. Craig Iscoe, Trial Judge)

(Argued September 30, 2014                    Decided July 23, 2015)

*Darrel L. Hieber*, with whom *John K. Villa* and *Kenneth C. Smurzynski* were on the briefs, for appellants/cross-appellees.

*Todd S. Kim*, Solicitor General, with whom *Irvin B. Nathan*, Attorney General for the District of Columbia at the time the briefs were filed, *Loren L. AliKhan*, Deputy Solicitor General, *Mary L. Wilson*, Senior Assistant Attorney General, Office of Solicitor General, *Bennett Rushkoff*, Chief, Public Advocacy Section, and *Jimmy R. Rock*, Assistant Attorney General, were on the brief, for appellee/cross-appellant.

Before BECKWITH and MCLEESE, *Associate Judges*, and NEWMAN, *Senior Judge*.

Opinion for the court by *Associate Judge* BECKWITH.

Opinion by *Associate Judge* MCLEESE, concurring in part and dissenting in part, at page 49.

BECKWITH, *Associate Judge*:    In the District of Columbia, sales tax is governed by D.C. Code §§ 47-2001 to 47-2027.[1]    That statute imposes tax on "vendors" for exercising the privilege of "selling at retail certain tangible personal property," as well as "selling certain selected services[.]"   D.C. Code § 47-2002 (a).   The definition of "retail sale" lists the services that are subject to sales tax. D.C. Code § 47-2001 (n)(1)(A)-(U).   This case involves the contours of one of the statute's enumerated services, "the sale or charge for any room . . . furnished to transients by any hotel[.]"   D.C. Code § 47-2001 (n)(1)(C).   Specifically, the District of Columbia and appellants online travel companies (OTCs) read that statute differently as applied to the retail margins the OTCs earn when they facilitate transactions between customers and hotels in the District of Columbia. The District argues that the OTCs are "vendors" liable for sales tax, and seeks to collect tax on the gross receipts of the entire transaction that occurs between the OTC and its customer.   The OTCs argue that the only taxable transaction under the

---

[1]   This opinion resolves the tax liability of appellants for their activities in the District dating back to 1998.  The District brought suit on March 22, 2011, and the District's sales tax law has been amended several times since then.  Unless stated otherwise, the sales tax law is discussed as it existed before April 8, 2011, and citations are to the 2001 version of the D.C. Code.  When this opinion discusses the changes in the District sales tax law that have taken place since April 8, 2011, citations are to the 2012 version of the D.C. Code.

statute is the one that occurs between the customer and the hotel—one in which the OTC participates only indirectly—and therefore sales tax is not due on the retail margins the OTC retains for itself. The matter is ultimately one of statutory construction. The statute is not entirely clear, and both sides read it in a reasonable manner. The Superior Court granted summary judgment to the District, reasoning that because the tax is a sales tax rather than an operator's tax, the amount that the OTC charges the customer—retail margins included—constitutes "the sale or charge for any room . . . furnished to transients by any hotel" under the statute, notwithstanding that it is ultimately the hotel, rather than the OTC, that does the actual furnishing. We agree.

Having found that the OTCs are liable for the District of Columbia sales tax, we confront a second issue concerning the extent of that tax liability. The District argues that the OTCs are liable for tax on the entire amount they collect from their customers, including the "sales tax reimbursement" amount that the OTCs have been passing on to the hotels, which the hotels, in turn, remit to the District as the sales tax due on the amount the hotels earn on the deal. In reply, the OTCs argue that this "sales tax reimbursement" amount should be excluded from the taxable "sales price" by the plain text of D.C. Code § 47-2001 (p)(2)(D). The "sales price" is defined as the "total amount paid" to a "vendor" by a "purchaser" for the taxable

service, but—as the District concedes—expressly excludes "[t]he amount of reimbursement of tax paid by the purchaser to the vendor under this chapter[.]" D.C. Code § 47-2001 (p)(2)(D). Nevertheless, the District claims that the OTCs are not entitled to the benefit of the § 47-2001 (p)(2)(D) exclusion because the OTCs have been failing to state the tax reimbursement amounts separately when collecting such amounts from their customers, and the separate statement is one of the chapter's requirements. Therefore, the District contends, those reimbursement amounts have not been properly collected "under this chapter" and are not entitled to the benefit of the § 47-2001 (p)(2)(D) exclusion. The Superior Court rejected that reading of the statute and granted summary judgment to the OTCs because, while the statute does require tax reimbursement amounts to be stated separately, it does not make the separate statement a prerequisite to being a "reimbursement of tax paid by the purchaser to the vendor under this chapter[.]" Put differently, the Superior Court read § 47-2001 (p)(2)(D) as simply excluding the tax reimbursement amount from the sales price, rather than creating an exclusion that vendors "earn" when they state the sales tax reimbursement amount separately and "forfeit" when they do not. While requiring a vendor to forfeit the § 47-2001 (p)(2)(D) exclusion when the vendor fails to state the tax reimbursement amount separately would be a permissible statutory scheme, the Superior Court was not convinced that that is the scheme Congress had in mind, and neither are we. We

reject the District's invitation to read such a forfeiture into the words "under this chapter," and affirm the trial court's grant of summary judgment to the OTCs with respect to the § 47-2001 (p)(2)(D) exclusion.

## I.    The Facts

Appellant OTCs operate websites that allow customers to search for, compare, book, and pay for travel reservations.  In that respect, the OTCs serve as intermediaries between customers and a host of travel service providers, including car rental companies, airlines, and—importantly for this appeal—hotels.  The OTCs' primary business model for the sale of hotel rooms is known as the merchant model:  a uniform, nationwide model that operates the same way, in all relevant respects, for all OTCs and in all jurisdictions, including in the District of Columbia.  The OTCs have been using the merchant model to book hotel stays in the District since at least the late 1990s.

Under the merchant model, the OTCs contract with hotels for the right to sell hotel rooms to online customers at a "retail rate," while paying the hotels that actually furnish the rooms some lower, negotiated "net rate."  In a typical merchant model transaction, a customer uses an OTC's website to search for and select a hotel room.  The customer enters her payment information directly into the OTC's website, the OTC forwards the reservation request to the hotel, and the hotel

determines whether to accept the request based on factors like availability. The OTC must communicate with the hotel before confirming because the hotel retains the ability to change room rates and availability, even seconds after such information is displayed to a customer on an OTC website. These are high-speed communications that are processed through the OTCs' websites and servers, and might run between the OTC and a particular hotel, between the OTC and a national or regional hotel chain, or between the OTC and certain third-party intermediaries that hotels use to transmit this sort of information. If the hotel accepts the booking, it sends a confirmation number to the OTC, which then charges the customer's credit card and forwards that confirmation number to the customer. No money changes hands directly between the customer and hotel, unless the customer chooses to purchase incidental items like room service or valet parking.

When charging the customer's credit card, the OTC collects an amount that consists of the net room rate that it will later forward to the hotel, a tax recovery charge, and a retail margin that the OTC keeps as profit. The tax recovery charge—which represents the sales tax due on the net room rate received by the hotel—is also forwarded to the hotel, which then remits it to the District. The District thus receives the sales tax due on the net rate paid to the hotel, but does not receive sales tax on the OTCs' retail margins—that is, on the difference between

(1) the total charges that the customer pays to the OTC and (2) the lower, net rate that the OTC forwards to the hotel.

When it charges the customer, the OTC does not isolate the "sales tax" as a separate amount, but instead calls the sales tax a "tax recovery charge," which it combines with a "service fee." As a result, the customer does not know how much sales tax has been paid on the transaction.

On March 22, 2011, the District brought suit to recover what it viewed as unpaid back sales taxes—those owed on the OTCs' retail margins—as well as penalties and interest related to the OTCs' merchant model sales in the District since 1998. On September 24, 2012, the Superior Court granted partial summary judgment to the District on the issue of the OTCs' basic tax liability, holding that the District's "gross sales tax law has applied to Defendants [the OTCs] at all times." The court also found that the OTCs had failed to state any sales tax amounts separately from the other retail charges, but reserved ruling on the tax effect of that finding. Then on December 9, 2013, the court resolved the tax effect of that ruling in favor of the OTCs, concluding that the sales tax amounts that the OTCs had been collecting from their customers and forwarding to the hotels should be excluded from the "sales price" on which the OTCs now owe sales tax, despite the fact that those sales tax amounts had not been stated separately. Both

parties appealed.

## II.     The Sales Tax Law

Pursuant to D.C. Code § 47-2001, the District of Columbia imposes sales tax upon all "vendors" for "the privilege of selling at retail certain tangible personal property and for the privilege of selling certain selected services[.]"  D.C. Code § § 47-2002 (a).  Many of these terms are defined in the statute.  A "vendor" is "a person or retailer selling property or rendering services upon the receipts from which a tax is imposed under this chapter."  D.C. Code § 47-2001 (w).  A "purchaser" is "a person who purchases property or to whom is rendered services, receipts from which are taxable under this chapter."  D.C. Code § 47-2001 (j).  A "sale" or "selling" is:

> [a]ny transaction whereby title or possession . . . of tangible personal property is . . . transferred . . . for a consideration, by a vendor to a purchaser, or any transaction whereby services subject to tax under this chapter are rendered for consideration or are sold to any purchaser by any vendor[.]

D.C. Code § 47-2001 (q).  Thus, a "sale" is either transferring possession of property, or rendering a taxable service, for consideration.  The taxable services are laid out in the definition of "retail sale" in § 47-2001 (n)(1)(A)-(U), the only one at issue here being the following:

> The *sale or charge for any room* or rooms, lodgings, or accommodations *furnished to transients by any hotel*, inn, tourist camp, tourist cabin, or any other place in which rooms, lodgings, or accommodations are regularly furnished to transients for a consideration.

D.C. Code § 47-2001 (n)(1)(C) (emphasis added). The total tax rate imposed on the "sale of or charges for any [hotel] rooms" is 14.5% of the "gross receipts." *See* D.C. Code § 47-2002 (2) (imposing tax of 10.05%); § 47-2002.02 (1) (imposing additional tax of 4.45%). Gross receipts are defined as "the total amount of the sales prices of the retail sales of vendors[.]" D.C. Code § 47-2001 (h).

The statute imposes tax only on the vendor, but requires that "reimbursement for the tax imposed upon the vendor shall be collected by the vendor . . . from the purchaser on all sales the gross receipts from which are subject to tax imposed by this chapter so far as it can be done." D.C. Code § 47-2003 (a). The statute further requires that the reimbursement be stated separately, mandating that

> [u]pon each sale of tangible personal property or services, the gross receipts from which are taxable under this chapter, the reimbursement of tax to be collected by the vendor from the purchaser under the provisions of this chapter shall be stated and charged separately from the sales price and shown separately on any record thereof at the time the sale is made or evidence of sale issued or employed by the vendor.

D.C. Code § 47-2009. There is one additional wrinkle, and that is in the definition

of "sales price." This is important because the tax is imposed upon "gross receipts" that are, in turn, defined in terms of "sales price." The statute defines "sales price" as "the total amount paid by a purchaser to a vendor as consideration for a retail sale," D.C. Code § 47-2001 (p)(1), and clarifies that the sales price includes "[a]ny services that are a part of the sale[.]" D.C. Code § 47-2001 (p)(1)(i). That definition of "sales price" is limited, however, by a number of exclusions that appear in § 47-2001 (p)(2). At issue in this case is the § 47-2001 (p)(2)(D) exclusion, which provides that "[t]he term 'sales price' does not include . . . [t]he amount of reimbursement of tax paid by the purchaser to the vendor under this chapter[.]"

Finally, there is a municipal regulation on the subject. 9 DCMR § 408, enacted in 1954[2] and entitled "Sales Price: Taxes, Interest, and Other Charges," begins with the preface: "In addition to the provisions of the Act"—meaning the D.C. Code § 47-2001 (p)(2) exclusions—"the term 'sales price,' as used in the Act, shall not include any of the exceptions set forth in this section." 9 DCMR § 408.1. Section 408.2 goes on to provide that: "The amount of reimbursement of taxes paid by the purchaser to the vendor under the Act shall not be subject to the tax if

_____

[2] The District points out that the language from the 1954 regulation has its roots in an even earlier regulation, which was adopted under authority of the District of Columbia Revenue Act of 1949. *See* 1 D.C. Reg. 4 (July 19, 1954).

the reimbursement amount is stated separately from the sales price."

Since the District filed this lawsuit on March 22, 2011, the District's sales tax statute has been amended several times. The D.C. Council inserted mention of "net charges and additional charges" as well as "room remarketer" into the definition of the taxable service in D.C. Code § 47-2001 (n)(1)(C) (2012 Repl.), which now reads:

> The sale or charge, *to include net charges and additional charges*, for any room or rooms, lodgings, or accommodations furnished to transients by any hotel, *room remarketer*, inn, tourist camp, tourist cabin, or any other place in which rooms, lodgings, or accommodations are regularly furnished to transients for a consideration.

D.C. Code § 47-2001 (n)(1)(C) (emphasis added). The statute goes on to define "room remarketer" as:

> [A]ny person, other than the operator of a hotel, inn, tourist camp, tourist cabin, or any other place in which rooms, lodgings, or accommodations are regularly furnished to transients for a consideration, having any right, access, ability, or authority, through an internet transaction or any other means whatsoever, to offer, reserve, book, arrange for, remarket, distribute, broker, resell, or facilitate the transfer of rooms the occupancy of which is subject to tax under this chapter and also having any right, access, ability or authority to determine the sale or charge for the rooms, lodgings, or accommodations.

D.C. Code § 47-2001 (o-1) (2012 Repl.). Similarly, the tax provisions at § 47-2002 (a)(2)(B) and § 47-2002.02 (1)(B) were amended to clarify that

> [i]f the occupancy of a room or rooms, lodgings, or accommodations is reserved, booked, or otherwise arranged for by a room remarketer, the tax imposed by this paragraph shall be determined based on the net charges and additional charges received by the room remarketer.

D.C. Code § 47-2002 (a)(2)(B); § 47-2002.02 (1)(B).

### III.    The Standard of Review

This court reviews summary judgment rulings de novo. *Square 345 Ltd. P'ship v. District of Columbia*, 927 A.2d 1020, 1023 (D.C. 2007). The court is to "conduct an independent review of the record . . . in considering whether the motion was properly granted." *Id*.

### IV.    The OTCs' Liability for Sales Tax

The rules of statutory construction are well established in the District of Columbia. *See District of Columbia v. Place*, 892 A.2d 1108, 1111 (D.C. 2006). "The first step in construing a statute is to read the language of the statute and construe its words according to their ordinary sense and plain meaning." *Hospitality Temps Corp. v. District of Columbia*, 926 A.2d 131, 136 (D.C. 2007) (citation and internal quotation marks omitted)). The court must give effect to a

statute's plain meaning when its words are clear and unambiguous. *See District of Columbia v. Bender*, 906 A.2d 277, 281-82 (D.C. 2006). Generally, "[w]hen the plain meaning of the statutory language is unambiguous, the intent of the legislature is clear, and judicial inquiry need go no further." *District of Columbia v. Gallagher*, 734 A.2d 1087, 1091 (D.C. 1999). "The literal words of a statute, however, are not the sole index to legislative intent, but rather are to be read in the light of the purpose of the statute taken as a whole, and are to be given a sensible construction." *Id.* (internal quotation marks and citations omitted). Courts must not "'make a fortress out of the dictionary,'" *Place*, 892 A.2d at 1111 (D.C. 2006) (quoting *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945) (Learned Hand, J.)), which is to say that "even where the words of a statute have a 'superficial clarity,' a review of the legislative history or an in-depth consideration of alternative constructions that could be ascribed to statutory language may reveal ambiguities that the court must resolve." *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 754 (D.C. 1983) (citations omitted). "Because the legislature must be presumed to have acted rationally and reasonably, with an awareness of the goals of the statutory scheme as a whole, the courts eschew interpretations that lead to unreasonable results, that create obvious injustice, or that produce results at variance with the policies intended to be furthered by the legislation." *In re C.L.M.*, 766 A.2d 992, 996-97 (D.C. 2001) (internal citations

omitted).

A special rule of construction applies to tax statutes, which under certain circumstances can tip the balance in favor of the taxpayer. In *District of Columbia v. Acme Reporting Co.*, this court made clear that "'the settled rule [is] that tax laws are to be strictly construed against the state and in favor of the taxpayer,' if the statute in controversy is unclear and ambiguous." 530 A.2d 708, 712 (D.C. 1987) (quoting 3A Sutherland, *Statutes and Statutory Construction* § 66.01 (C. Sands, 4th ed. 1986)). The *Acme* court tempered that presumption in the next three sentences, however, clarifying that:

> At the same time, we are mindful of the maxim that "tax laws ought to be given a reasonable construction, without bias or prejudice against either the taxpayer or the state, in order to carry out the intention of the legislature and further the important public interests which such statutes subserve." [Sutherland] § 66.02. Further, "[s]ince the obligation to pay taxes arises only by force of legislative action, the nature and extent of that liability is determined by the legislative meaning. Therefore, all the rules of statutory construction are relevant in the interpretation of revenue measures." *Id*. § 66.03.

*Acme*, 530 A.2d at 712. In essence, then, interpreting tax laws is a three-step process: if the court is confronted with ambiguity on the face of the statute, step two is to turn to the legislative history and the other tools of reasonable statutory construction, and—if the ambiguity persists—step three is to construe the statute

strictly against the state and in favor of the taxpayer, in accordance with the *Acme* rule. As the trial court explained: "Only if the statute remains ambiguous after resorting to all of the normal tools of statutory construction should the Court construe any remaining reasonable ambiguity against the District and in favor of the taxpayers."

Following the rules of statutory construction in general and *Acme* in particular, the first step in resolving the OTCs' contested sales tax liability is to determine whether the statutory language is plain and unambiguous. We begin our inquiry by considering the statutory text as it existed prior to the 2011 amendment, and then turn to the amendments to the extent necessary. "A statute is ambiguous when it is capable of being understood in two or more different senses by reasonably well-informed persons." Sutherland, *supra*, § 66.03. We hold that the statute is, on its face, ambiguous.

As noted above, both the OTCs and the District read the pivotal text from D.C. Code § 47-2001 (n)(1)(C)—defining the retail sale at issue as "[t]he sale or charge for any room . . . furnished to transients by any hotel"—in a way that has facial plausibility. The OTCs are correct that the only verb in the definition is "furnish[ed]," and therefore it does not seem absurd to read the provision as a tax on the furnishing of rooms, which is arguably the service that the hotels, not the

OTCs, provide. It is thus plausible to read the "sale or charge," as the OTCs do, to refer to the *result* rather than the *taxable service*. On this reading, the "sale or charge" is merely that which occurs when the hotels exercise the taxable privilege of furnishing rooms.

The District, on the other hand, reads the statute as imposing tax directly on the *sale or charge* for any room that is ultimately furnished by a hotel, which sounds exactly like the service that the OTCs provide. This reading is also plausible, because nowhere does the statute specify that the party responsible for the "sale or charge" needs to be the same party responsible for the "furnishing" and because the presence of the words "sale or charge" at the beginning of § 47-2001 (n)(1)(C) suggests that the provision is aimed at the sales transaction whereby one "sells or charges" for the room, rather than the physical act of furnishing it. Given the reasonableness of the District's reading—"the tax is a *sales* tax, not an operator's tax; it applies to the 'privilege of selling selected services,' not to the services themselves" (emphasis in original)—we agree with the trial court's finding that

> [b]oth the Defendant and the District read the statute in
> the manner a well-informed person might. Because the
> plain meaning of the statute is open to two reasonable,
> yet opposing, interpretations, it is necessary under *Acme*
> to turn to other tools of reasonable statutory

interpretation in order to discern the purpose of the statute and avoid absurd results.

Turning to an analysis of the statute's structure, purpose, and legislative history, we conclude that these considerations decisively favor the District's position. First, while the text of § 47-2001 (n)(1)(C) leaves considerable ambiguity about which service exactly is subject to tax under the provision, an examination of the District's sales tax provisions as a whole lends support to the District's contention—and the well-reasoned conclusion of the trial court—that the tax is levied on the "sale or charge" for the service, rather than on the provision of the service itself.

As an initial matter, it is significant that the sales tax is imposed upon vendors for "the privilege of *selling* certain selected services," rather than *rendering* or *providing* them. *See* D.C. Code § 47-2002. The mention of both the "selling" in § 47-2002 and the "sale or charge" in § 47-2001 (n)(1)(C) suggests that the sale is the subject of the tax, and the OTCs' arguments to the contrary—while plausible on their face—ultimately fail to withstand close scrutiny. For one, the sales tax is imposed on the "gross receipts" of a retail sale under the statute. The "gross receipts" include the entirety of the "sales price" and, here too, the statutory language is notably inclusive in reaching the ancillary services that are part of the taxable transaction: "'Sales price' means the total amount paid by a

purchaser to a vendor as consideration for a retail sale . . . the total amount of the sales price includes . . . any services that are a part of the sale[.]" D.C. Code § 47-2001 (p)(1). This language, and the emphasis it places on taxing the sales transaction in its entirety, is instructive. While it could be consistent with the OTCs' reading, if one views the "retail sale" as solely that part of the sales transaction whereby a hotel physically furnishes a room to a transient, several problems with that reading emerge when one views the sales tax statute as a whole.

First, the OTCs contend that "the sale or charge" that appears at the beginning of § 47-2001 (n)(1)(C) cannot be the subject of the tax because, since "sale" is defined in § 47-2001 (q) as a "transaction whereby services subject to tax under this chapter are rendered for consideration," the word "sale" must therefore be a *reference to* a taxable service—here the furnishing of hotels rooms—rather than a taxable service in itself. Yet the OTCs' argument—that "[s]ale and charge are used as nouns; they are what results when a hotel has performed the specified activity, *i.e.*, furnished a room for consideration"—cannot be reconciled with the other goods and services enumerated in § 47-2001 (n)(1).

Despite the admittedly confusing definition of "sale" found in § 47-2001 (q), it is clear that the term "sale" is being used in its everyday sense in § 47-2001 (n)(1) and that it is precisely the "sale" that is the focus of § 47-2001 (n)(1)(C), just

as a sale is the focus of every other provision of § 47-2001 (n)(1). For context, it is helpful to consider § 47-2001 (n)(1)(C) in relation to its neighboring provisions:

> (1) "Retail sale" and "sale at retail" mean the sale in any quantity or quantities of any tangible personal property or service . . . taxable under the terms of this chapter. . . . For the purpose of the tax imposed by this chapter, these terms shall include, but not be limited to, the following:
>
> (A)
>
> (i) Sales of food or drink prepared for immediate consumption . . . ; and
>
> (ii) Sales of food or drink when sold from vending machines;
>
> . . .
>
> (B) Any production, fabrication, or printing of tangible personal property on special order for a consideration;
>
> (C) The sale or charge . . . for any room . . . furnished to transients by any hotel . . .
>
> (D) The sale of natural or artificial gas, oil, electricity, solid fuel, or steam;

§ 47-2001 (n)(1). Semantic wrangling aside, the clear purpose of § 47-2001 (n)(1) is to enumerate certain transactions for the purpose of bringing them within the ambit of the District's sales tax law. Unsurprisingly for a chapter entitled "Gross Sales Tax," all of these provisions focus on a sale, and all of them focus on the sale from the customer's perspective. For example, § 47-2001 (n)(1)(A)(i) taxes the "[s]ales of food or drink prepared for immediate consumption[.]" One could not

fairly argue that this is a tax only on the service of "preparing." One could not seize on the only participle in the provision, extract the active tense of the underlying verb, and then hold out that verb as the taxable activity. Rather, § 47-2001 (n)(1)(A)(i) is plainly a tax on the "sale" of food, and the rest of the provision merely describes the food that is to be taxed, that is, food "prepared for immediate consumption[.]" In arguing that "one is a 'vendor' only if one exercises the taxable privilege of 'furnishing' rooms to transients for consideration," the OTCs are following just that methodology: they are seizing on the only verb (or more precisely, participle) in § 47-2001 (n)(1)(C), extracting the active tense of that verb, and then holding out that verb as the taxable activity. But that maneuver is no more correct in the context of furnished rooms than in the context of prepared foods. Rather § 47-2001 (n)(1)(C) plainly taxes "[t]he sale or charge . . . for any room," and the rest of the provision describes the rooms that are to be taxed; it is those rooms "furnished to transients by any hotel[.]"[3]

The noun "sale"—and not "prepare," the verb (or, again, participle) that appears later in the provision—is the taxable activity in § 47-2001 (n)(1)(A)(i).

---

[3] Myriad middlemen, not unlike the OTCs, undoubtedly play a role in many transactions involving the sale of prepared food. Yet that fact does not make the tax anything other than a conventional sales tax on the amount the purchaser pays for the food.

But in arguing that "sale" cannot similarly be the taxable activity in § 47-2001 (n)(1)(C), the OTCs rely on a "property" versus "services" distinction. They appear to acknowledge that the word "sale" can be the subject of the tax for the transfer of a good, but not for the provision of a service, claiming that "[t]he Statute's use of passive voice in defining another type of retail sale, 'sales of food or drink prepared for immediate consumption,' does not help the District [because] [t]he tax is imposed on the 'sale' of that specific type of *property*, not on the service of preparing it" (citations omitted) (emphasis in original). This argument relies on a very strained reading of the statute: while the definition of "sale" in § 47-2001 (q) appears to offer different definitions for the transfer of property versus the provision of services—for property, a "sale" is "any transaction whereby title or possession . . . is or is to be transferred" and for services, a "sale" is "any transaction whereby services subject to tax . . . are rendered for consideration," *see* § 47-2001 (q)—we are not inclined to read these definitions as substantively different, much less to assume that Congress was knowingly weaving back and forth between these definitions when it was enumerating the transactions that qualify as "retail sales" in § 47-2001 (n)(1). The OTCs appear to contend that the difference between § 47-2001 (n)(1)(A)(i)'s "sale of food or drink prepared for immediate consumption" and § 47-2001 (n)(1)(C)'s "sale or charge . . . for any room . . . furnished to transients by any hotel" is that the former must be construed

under the definition of "sale" that applies to the transfer of property and the latter under the definition of "sale" that applies to the provision of services. But that seems backwards. Instead of having to go through each provision and classify it as a "property" or a "service"—which itself might raise difficult interpretive questions—the more natural reading of the statute is much simpler; it is just a tax on the sales transactions that are enumerated within it. Viewed this way, the dual definition of "sale" in § 47-2001 (q) seems merely to emphasize that some of those transactions will deal in goods, like § 47-2001 (n)(1)(A)(i), and others will deal in services, like § 47-2001 (n)(1)(C). Thus, the amount that the purchaser pays for prepared food is taxed under § 47-2001 (n)(1)(A)(i), and the amount the purchaser pays for furnished rooms under § 47-2001 (n)(1)(C).

The purpose of the sales tax statute—which is simply to tax the enumerated transactions, and to tax them in their entirety—overshadows fine points like the tense of the words. D.C. Code § 47-2001 (n)(1)(B), taxing "[a]ny production, fabrication, or printing of tangible personal property on special order for a consideration," is illustrative. The provision does not include the word "sale" at all, but could easily be phrased as "the sale of tangible personal property produced, fabricated, or printed on special order for a consideration." That semantic change would not change the substance, and the provision could probably even be

rewritten to sound more like a tax on a service than a good. Similarly, much ink has been spilled in this case over the meaning of "[t]he sale or charge . . . for any room . . . furnished to transients by any hotel," with the OTCs intimating that the District is pretending that the statute says "selling" instead of "sale," and the District intimating that the OTCs are pretending that the statute says "furnishing" instead of "furnished." Yet at the end of the day, the provision appears to be just one way of imposing a tax on the amount of money that people pay to stay in hotel rooms in the District of Columbia. The statute could just as easily have placed a tax on "sales of hotel rooms" or "the selling of hotel rooms" or, perhaps even something like "hotel stays booked." In the context of a sales tax statute that taxes transactions at the point of sale—in that it imposes tax on the "sales price" that the purchaser pays in certain transactions, with "sales price" being defined to include "[a]ny services that are a part of the sale," D.C. Code § 47-2001 (p)(1)(i)—the meaning of the statute is clear: by imposing tax on the "sale or charge . . . for any room . . . furnished to transients by any hotel," the sales tax statute is taxing the sales transaction by which a customer purchases a hotel room in the District of Columbia. The OTCs' retail margins are a part of that sale.[4]

---

[4] The OTCs argue at length that the retail margins should not be part of the taxable sale because the margins are earned not for "furnishing rooms" but for "facilitating reservations." We do not take issue with the OTCs' characterization of what they do. Because the District's statute imposes tax not on the furnishing of

(continued…)

Not only do the structure and purpose of the District's sales tax law evince Congress's intent to tax the full amount that customers pay for hotel rooms in the District of Columbia, but the legislative history confirms this result. Congress aimed to tax the amount that the purchaser pays for the enumerated service, and—in targeting the sale—sought to include ancillary or intermediary transactions. While Congress in the year 1949 did not contemplate online travel companies matching customers with hotels using sophisticated information technology, it did know what a middleman was and did address the issue. We draw the same conclusion as the trial court, which reasoned:

> The structure of the statute is clear: it is designed to tax the transaction by which the room is sold to the transient, not to a third party intermediary. The legislative history further supports that transactions where one party purchases an item and sells it virtually unchanged to the final purchaser, are taxable. In the Senate report on H.R. 3704, the Committee on the District of Columbia noted that the initial purchase was not intended to be included in the statutory definition of retail sales. S. Rep. No. 81-260, at 8 (1949) ("[Retail sales is] defined as to be

---

(…continued)

rooms but on the "sale or charge . . . for any room . . . furnished," however, that characterization does the OTCs no good. Ultimately, "facilitating reservations" appears to be another way of saying "selling rooms." And in fact, "selling rooms" appears to be just how the OTCs themselves described the service they provide before the onset of this sort of sales tax litigation. *See Travelocity.com LP v. Wyo. Dep't of Revenue*, 329 P.3d 131, 142 (Wyo. 2014) ("Before the OTC sales tax cases arose around the nation, the OTC/hotel contracts used language indicating that OTCs sold rooms.").

> inapplicable to sales where the purpose of the purchaser is to resell the property so transferred in the form in which bought by him.")[.] This lends support to the Court's holding that . . . it is the . . . sale to the ultimate purchaser [that is taxable under § 47-2001 (n)(1)(C)].

In response, the OTCs make a legislative history argument that dates back not to the origins of the sales tax law, which is the District of Columbia Revenue Act of 1949, Pub. L. No. 81-76, § 114 (a)(3), 63 Stat. 112, 113 (1949), but to an amendment passed in the 1990s. In 1998, the D.C. Council both repealed the Hotel Occupancy Tax—which imposed tax on the "occupancy of each room . . . in a hotel" and applied only to persons "operating a hotel in the District of Columbia," *see* D.C. Code § 47-3202 (1981)—and also increased the tax imposed on "the sale or charges for any room . . . furnished to a transient by any hotel" under § 47-2002.02 (1). Washington Convention Center Authority Financing Amendment Act of 1998, D.C. Law 12-142 (1998). Because these two amendments both occurred in 1998, the OTCs conclude that "the Council viewed the Hotel Occupancy Tax—imposed on 'operators'—and the sales tax—imposed on 'vendors' that furnish rooms—as being imposed on the same persons—hotels that possess rooms[.]" As the District points out, however, the OTCs cite no legislative history to suggest that the D.C. Council intended the amended § 47-2002.02 (1) to have the same meaning as the repealed Hotel Occupancy Tax. To the contrary, it seems more reasonable to conclude the opposite, because if the

Council intended the newly amended § 47-2002.02 (1) to be coextensive with the repealed Hotel Occupancy Tax, it would presumably have used the same word, "operator." The most important point to be gleaned is that the District used to have an occupancy tax imposed on the hotel operator, but that tax has long been repealed in favor of an increased sales tax. That history weighs in favor of the District's position—and the trial court's conclusion—that it is the entire sales transaction that is taxable under § 47-2001 (n)(1)(C).

Because we agree with the trial court's determination that § 47-2001 (n)(1)(C) has always extended to reach the OTCs' retail margins, the 2011 amendments to the statute whereby the D.C. Council sought to clarify the reach of the provision are not critical to the outcome of this case. To the extent that they shed light on the meaning of § 47-2001 (n)(1)(C), however, the amendments favor the District and exacerbate the problems with the OTCs' strained reading of the statute. As the trial court concluded, the legislative history of the 2011 amendments is very clear about the Council's purpose. The preamble for the amendment inserting "room remarketer" into D.C. Code § 47-2002 and § 47-2002.02 confirmed its purpose "to amend Title 47 of the District of Columbia Official Code to clarify and mandate that online travel companies pay the full amount of tax on the amount paid by the occupant," Payment of Full Hotel Taxes

by Online Vendors Clarification Act of 2010, D.C. Law 18-364 (2011), and the fiscal impact statement explained that the amendment would clarify that District sales taxes "appl[y] to the total amount charged to the consumer by the room remarketer, instead of to the amount charged to the room remarketer by the hotel[.]" District of Columbia Office of the Chief Financial Officer, *Fiscal Impact Statement—"Payment of Full Hotel Taxes by Online Vendors Clarification Act of 2010"* (Dec. 2, 2010). The Council certainly intended to clarify that the OTCs' retail margins are taxable under § 47-2001 (n)(1)(C), but it saw no need to overhaul the provision to achieve that result. Rather, it addressed the issue by clarifying that when "room remarketers" sell hotel rooms in the District, the retail margins are part of the transaction and subject to tax. The OTCs' response to the amendment exposes the snag in their reading: the OTCs contend that, because the amendment merely makes a new category of actors—"room remarketers"—subject to the tax but does not change the underlying taxable privilege—purportedly the "furnishing of rooms"—the amendment only applies to OTCs that "(i) purchase a block of room nights; (ii) obtain the risk of loss for any room nights that go unsold; (iii) mark-up the price of a room night and resell it to individual transients, and (iv) thereby actually 'furnish' rooms[.]" This is an unfounded interpretation of the amendment, however, because steps (i) through (iv) outlined above are not how OTCs behave, and, as the amendment's legislative history makes plain, the point of

the amendment was to clarify that § 47-2001 (n)(1)(C) does apply to OTCs when they operate under the merchant model.

Moreover, the OTCs' reading of the statute would leave many provisions of the District's sales tax law vulnerable to potential loopholes and, as the trial court recognized, could lead to the absurd result in which nobody would be liable for sales tax:

> Nobody would be responsible for the retail sales tax under the OTCs' model. The hotel has no contract with the purchaser until check-in. No monetary transaction ever occurs between the hotels and the ultimate purchaser and thus there is no sale, by the statutory definition, to tax. No tax would ever be due on either of the transactions, a result plainly at odds with the structure and history of the act.

In response, the OTCs point out that—as even the District concedes—the hotels have been remitting sales tax on the "net rates" they receive on the transactions. Thus, the hypothetical in which the hotels and the OTCs both dodge the sales tax has not been occurring, and it is not clear how it would work. There is no allegation that the OTCs are conspiring with or are somehow controlled by the hotels and if, for example, a hotel tried to evade the sales tax by transacting with itself and then remitting tax based only on a "net rate" that it calculated by removing some "convenience" or "booking" fee, then that would constitute a sham transaction that could be ignored under existing tax principles. *See Black &*

*Decker Corp. v. United States*, 436 F.3d 431, 441 (4th Cir. 2006).

While the loophole that troubled the trial court does not appear to be gaping, we are unpersuaded by the OTCs' contention that "[e]ven if the Superior Court's perceived loophole were nonetheless a viable concern, that loophole must be filled by the District Council, the legislative branch, not the courts." Rather, as the District argues, the rules of statutory interpretation in general and *Acme* in particular require consideration of practical consequences when determining a reasonable construction of the District's sales tax law. *Acme*, 530 A.2d at 715 (stating that the "'reasonableness of a construction can often be tested by considering the consequences of a different one'") (citation omitted). Regardless of the ease with which the OTCs and the hotels might conspire to lessen or eliminate the tax consequences of these sales, then, the OTCs' interpretation— inserting a middleman between vendor and purchaser—would result in the District receiving sales tax on only part of transactions that Congress intended to tax in their entirety. We therefore agree with the District that "[w]hile the OTCs' interpretation would allow retailers to avoid paying tax on some retail transactions—a result Congress surely did not intend—the District's interpretation avoids this problem: the tax is imposed on the charge to the customer."

While there is no case law that controls this dispute, this court's precedents

also favor the District's contention that the OTCs owe sales tax on their retail margins pursuant to § 47-2001 (n)(1)(C).  The OTCs cite two of this court's decisions in support of their argument that, in order to be a "vendor" liable for sales tax, the seller must provide the underlying service in addition to merely selling or charging for it.  Neither case that the OTCs cite squarely supports that proposition:  both *Acme*, 530 A.2d at 712-16 (discussing the scope of "public stenographic services"), and *Hospitality Temps*, 926 A.2d at 134-38 (discussing the scope of "real property maintenance services"), addressed whether a service being offered falls within one of the categories enumerated in the sales tax law.  These cases do not hold that, to be a "vendor," a taxpayer must both sell or charge for an enumerated service *and* personally provide it as well.

The parties also draw starkly different conclusions from this court's decision in *Square 345 Ltd. P'ship v. District of Columbia*.  In *Square 345*, this court addressed the question whether a hotel's so-called "attrition fees" are subject to sales tax as a retail sale of a hotel room.  927 A.2d at 1022.  "Attrition fees" result when a group contracts with a hotel to make available a block of rooms at a given price until a certain date, typically so that the group's members can attend some event.  *Id*.  If the group's members do not reserve some agreed-upon minimum number of rooms, the group is responsible for the difference between the number

of room nights actually used and the number of room nights guaranteed; that amount is called an attrition fee. *Id.* This court in *Square 345*—after observing that "the statute permits the District to tax the hotel 'for the privilege of selling certain selected services,' including the 'sale of or charges for any room or rooms . . . furnished to a transient by any hotel'"—held that the attrition fee was subject to sales tax because the hotel "provides a [taxable] 'service' when it sets aside a room block for a group and its participants at a discounted rate for a specified period of time." *Id.* at 1024.

The OTCs claim that the *Square 345* opinion is inconsistent with the reading of the statute that this court announces today because *Square 345* placed the tax burden on the hotel and did not turn the intermediary group into a "vendor" responsible for sales tax. We disagree. In *Square 345*, the hotel was, in a meaningful sense, "selling" the block of rooms to the group in exchange for receiving the guaranteed attrition fee. The *Square 345* court explained this explicitly:

> Once the group contracts for the room block, the group's participants obtain the right to reserve a room at the favorable rate. During the contractually specified period, no persons other than the group's participants are permitted to reserve the rooms set aside in the room block. This exclusive right to occupy the rooms, upon reservation, thereby renders the group's participants plainly within the definition of transients as provided by

the Code. The statute does not require the transient to actually exercise his or her right to occupy in order for the service to be taxable; therefore, the attrition fee falls within the category of taxable events covered by D.C. Code § 47-2002.

*Id*. at 1024 (internal citations omitted). While both the OTCs here and the group that guaranteed the attrition fee there can be characterized as "intermediaries" in some sense, the reasoning from *Square 345* does not apply to the OTCs operating pursuant to the merchant model. The District's argument in *Square 345* highlights the differences between the two cases. There the District argued, in the alternative, that "the group who enters into the contract with a hotel should be considered the transient because it makes the block reservation on behalf of its participants and pays the total contracted costs of the rooms should the participants fail to do so." *Id*. at 1023. The same dynamic is not at work in this case, and it would make no sense to view the OTCs as "transients" under the tax code. To the extent that *Square 345* dealt with a travel intermediary and did not make that intermediary a "vendor" liable for sales tax, however, we acknowledge that *Square 345* lends some support to the OTCs' argument. But it is scant support, both because these two intermediaries appear eminently distinguishable, and because other parts of the *Square 345* reasoning contradict the OTCs' position here. In *Square 345*, the hotel argued that collecting an attrition fee did not fall within the taxable service because no physical furnishing occurred. *See id.* at 1023. The *Square 345* court rightly

rejected that argument because it was the setting aside of rooms—rather than any actual furnishing—that incurred sales tax liability. *See id.* at 1024. The same reasoning applies in this case. Whether or not the OTCs actually "furnish," they sell or charge for hotel rooms in the District of Columbia. They are therefore "vendors" liable for sales tax, and neither *Square 345* nor any other precedent forecloses that result.[5]

Finally, the OTCs argue that the imposition of back sales taxes is unfair and foreclosed by the four affirmative defenses of laches, waiver, equal protection, and the statute of limitations. We disagree.

"Laches is the principle that equity will not aid a plaintiff whose unexcused delay, if the suit were allowed, would be prejudicial to the defendant." *Fed. Mktg.*

---

[5] While both parties cite a slew of case law from other jurisdictions in support of their arguments, today's holding is consistent with the way most other courts have dealt with the issue. The OTCs cite many cases holding that they do not "furnish rooms." For the reasons discussed, however, the OTCs need not furnish rooms to be liable for the District sales tax. The District cites cases in which courts applying tax statutes aimed at taxing the economic activity of selling or charging for hotel rooms have interpreted those statutes as applying to the entirety of the OTCs' merchant model sales. The OTCs attempt to distinguish these cases by arguing that none of them dealt with a statute with the District's definition of "sale." But this court has already rejected the OTCs' argument that the definition of "sale" in § 47-2001 (q) somehow turns § 47-2001 (n)(1)(C) from a sales tax into an operator's tax.

*Co. v. Va. Impression Prods. Co.*, 823 A.2d 513, 525 (D.C. 2003). This jurisdiction, however, has accepted the principle of *nullum tempus occurrit reipubliciae* ("no time runs against the state"), by which neither laches nor statutes of limitations will constitute a defense to suit by the sovereign in the enforcement of a public right. *See New 3145 Deauville, L.L.C. v. First Am. Title Ins. Co.*, 881 A.2d 624, 629 (D.C. 2005). The OTCs do point to a case in the District that has not followed the doctrine, but that exception is limited to zoning enforcement actions and the doctrine squarely applies in the tax collection context. *See Stonewall Constr. Co. v. McLaughlin*, 151 A.2d 535, 536 (D.C. 1959). And even assuming that laches were an available defense, the equitable remedy would not be appropriate here because "if the party interposing the defense of laches substantially contributes to the delay he is precluded from taking advantage of the defense." *Evans v. United States Fid. & Guar. Co.*, 127 A.2d 842, 848 (D.C. 1956). While the OTCs claim that the District has known about the alleged noncompliance for nine years and taken no action whatsoever, prejudicing the OTCs because they will not be able to seek reimbursement from past customers, the OTCs' fairness argument is ultimately unavailing. It is clear from looking at the OTCs' statements to investors and to the SEC that the OTCs understood, since at least 2002, that they might owe sales tax on the full amount of their merchant model sales. Any laches argument the OTCs might have is severely undermined

by the OTCs' own failure to seek guidance from the District concerning their potential sales tax obligations for more than ten years.

Waiver is the unilateral, voluntary, and intentional relinquishment of a known right. *In re Thomas*, 740 A.2d 538, 547 (D.C. 1999). The OTCs' waiver argument is closely related to their laches argument. In support of waiver, the OTCs point to the District's delay in bringing this case, its practice of accepting sales tax from the hotels based only on the "net rates," and a quotation from an article in the *Washington Business Journal* in which a former Attorney General suggested that litigation against the OTCs would be a "waste of time." Yet none of these three fairly evinces waiver. Allowing a defense of waiver based on the District's mere failure to bring the action earlier would eviscerate the principle of *nullum tempus occurrit reipubliciae* discussed above. And the fact that the District accepted sales tax indisputably owed to it on one part of a transaction in no way suggests waiver of a prospective claim for sales tax on another part of the transaction. And finally, the quotation from former Attorney General Peter Nickles was taken out of context. When considered in full, that statement makes clear that the District was keeping its options open:

> [D.C. Attorney General] Nickles, however, said he is monitoring [similar sales tax] cases in other jurisdictions but would not take any action until a court delivers a "definitive decision." Until then, he said, action is a

> waste of time. "This litigation is going to go on a very long time," he said. "When it becomes clear there is a case we will decide whether to take action."

Jonathan O'Connell, *D.C. Could Be Losing Hotel Taxes to Online Companies*, Wash. Bus. J. (May 29, 2009).

The equal protection guarantees contained in the United States Constitution are violated when a law is not applied evenhandedly. *Smith v. United States*, 460 A.2d 576, 578, n.3 (D.C. 1983). The OTCs cite a number of cases that point to a "duty of consistency" that applies when the government is interpreting and applying tax laws to similarly situated taxpayers. These "duty of consistency" cases stand for the proposition that the government may not interpret a tax statute to apply to one taxpayer and not to a similarly situated one. As the trial court explained, however, there is no evidence that the District has ever found that its sales tax law does not apply to other OTCs' merchant model transactions, and so this case does not really involve a claim of inconsistent application of a tax law. Rather, in identifying a small OTC that the District has not also sued for failure to pay sales taxes, the OTCs are effectively making a selective enforcement claim. "To support a defense of selective enforcement or discriminatory prosecution, appellant must show that the government's selection of it for prosecution has been based upon some form of invidious or otherwise impermissible form of discrimination, or is arbitrary and capricious." *Hospitality Temps*, 926 A.2d at

No such improper motivation is alleged here. It does not violate equal protection principles for the District to make enforcement decisions based on whether successful litigation will yield sufficient revenue to make legal action worthwhile, which is what appears to have happened in this case.

Finally, the Superior Court properly rejected the OTCs' statute of limitations argument, which is based on D.C. Code § 47-4301 (a)'s requirement that "tax imposed under this title shall be assessed within three years after the return was filed." While the trial court suggested that this action might be taken out of the statute of limitations by the *nullum tempus occurrit reipublicae* doctrine, reliance on that doctrine is unnecessary here because the statute provides a clear exception to the three-year limitation for a vendor who fails to file the required monthly and annual sales tax returns. *See id.* §§ 47-2015 (a), -2017, -4301 (d)(1)(C). Indeed, § 47-4301 (d)(1)(C) provides that, in the case of a vendor's failure to file a tax return, "the tax may be assessed, or a proceeding in court for the collection of the tax may begin without assessment, at any time." As we have held here, the OTCs are vendors responsible for sales tax on the entirety of their merchant model transactions, and—by their own admission—did not file sales tax returns on these sales. While the OTCs attempt to rely on the tax returns filed by the hotels to trigger the three-year statute of limitations, there is no provision in the District's

tax code that would allow one taxpayer to bootstrap off of another's tax return in this way. Because the OTCs failed to file tax returns on what were taxable sales in the District, this case falls squarely within the "failure to file" exclusion of § 47-4301 (d)(1). The statute of limitation does not bar this action.

Like the trial court, we conclude that an analysis of the sales tax law's structure, purpose, and legislative history is sufficient to resolve the ambiguity that existed on the face of the law. Because ambiguity does not remain after the normal tools of statutory of construction have done their work, the *Acme* ambiguity rule does not come into play. We hold that the OTCs, in their merchant model transactions, were engaging in "the sale or charge for any room . . . furnished to transients by any hotel" within the meaning of D.C. Code § 47-2001 (n)(1)(C), and are therefore vendors liable for the District sales tax.

## V. The § 47-2001 (p)(2)(D) Exclusion

Given that we have found the OTCs liable for the District sales tax, the final issue in this case is whether they owe tax on the "sales tax reimbursement" amounts that they have been passing on to the hotels, ultimately to be remitted to the District as the tax due on the "net rate." The trial court, granting summary judgment to the OTCs, concluded that they do not, because "[t]he amount of reimbursement of tax paid by the purchaser to the vendor under this chapter" is

expressly excluded from the definition of "sales price" by § 47-2001 (p)(2)(D). We agree.

The dispute over the § 47-2001 (p)(2)(D) exclusion concerns three words. The provision excludes from the term "sales price" "[t]he amount of reimbursement of tax paid by the purchaser to the vendor *under this chapter*" (emphasis added). Because a different part of the chapter requires the seller to state the amount of sales tax separately—and the OTCs have indisputably not been complying with the separate statement requirement—the District contends that any sales tax reimbursement that the OTCs have collected from their customers and passed on to the hotels does not count as having been paid "under this chapter," and therefore is not entitled to the § 47-2001 (p)(2)(D) exclusion.

The District's argument depends on a problematic reading of the statute. The statute does not make compliance with the separate statement requirement a prerequisite to the § 47-2001 (p)(2)(D) exclusion. If Congress had wanted to exclude tax reimbursements from the tax base only when they were separately stated, it could have done so. Congress knew how to condition an exclusion on an amount being separately stated, and in fact did so in the very next provision of § 47-2001 (p)(2).

As a whole, § 47-2001 (p)(2) reads:

> (2) The term "sales price" does not include any of the following:
>
> (A) Cash discounts allowed and taken on sales;
>
> (B) The amount charged for property returned by purchasers to vendors upon rescission of contracts of sale when the entire amounts charged therefor are refunded either in cash or credit, and when the property is returned within 90 days from the date of sale;
>
> (C) The amount separately charged for labor or services rendered in installing or applying the property sold, except as provided in subsection (n)(1) of this section;
>
> (D) The amount of reimbursement of tax paid by the purchaser to the vendor under this chapter; or
>
> (E) Transportation charges *separately stated*, if the transportation occurs after the sale of the property is made.

(Emphasis added). While Congress made subsection (E) conditional on there being a separate statement, it did not do the same for section (D). And it is precisely because section (D) does not depend on a separate statement that the District seizes upon the last three words, "under this chapter," and uses those words to imply a link to the separate statement requirement found in § 47-2009. Thus, the District reads "under this chapter" in § 47-2001 (p)(2)(D) as requiring conformity with the separate statement requirement in § 47-2009 and, presumably, every other provision of the sales tax law. But that is a peculiar reading of "under this chapter." This can be seen, for example, in the text of § 47-2009 itself:

> Upon each sale of tangible personal property or services, the gross receipts from which are taxable *under this chapter*, the reimbursement of tax to be collected by the vendor from the purchaser *under the provisions of this chapter* shall be stated and charged separately from the sales price and shown separately on any record thereof at the time the sale is made or evidence of sale issued or employed by the vendor.

(Emphasis added). Section 47-2009, then, requires the separate statement of any sales tax reimbursement amount collected "under . . . this chapter," but it does not use "under this chapter" as a catch-all term for ensuring absolute compliance with all of the chapter's requirements. Rather, it uses the phrase in its regular sense, clarifying *which* sales are being discussed. The phrase is used in much the same way in § 47-2001 (p)(2)(D), where it again clarifies *which* taxes are being discussed—that is, only those in Title 47, Chapter 20, entitled "Gross Sales Tax."[6]

The District's arguments to the contrary are unpersuasive. First, the District relies on a municipal regulation, 9 DCMR § 408.2, which states that the tax reimbursement amount is to be excluded from the sales price if the reimbursement amount is stated separately. 9 DCMR § 408.2. The problem with this argument is

---

[6] Because we conclude that the statute, plainly read, does not provide that tax reimbursement amounts collected but not stated separately are subject to additional taxation, we need not address the OTCs' argument that such a law would constitute an impermissible "tax on tax."

that the regulation does not say that the tax reimbursement amount is to be excluded from the sales price *only* if stated separately. We acknowledge that 9 DCMR § 408.2 appears to be a completely superfluous provision, as its point is already expressed in § 47-2001 (p)(2)(D). And we also acknowledge that, under the *expressio unius est exclusio alterius* canon of statutory construction, it is sometimes reasonable to imply a missing "only" when the express mention of one alternative naturally excludes all others. *See, e.g., Odeniran v. Hanley Wood, LLC*, 985 A.2d 421, 427 (D.C. 2009) (explaining that "[a]lthough the 'expressio unius maxim . . . must be applied with a considerable measure of caution,' it is useful 'where the context shows that the draftsmen's mention of one thing . . . does really necessarily, or at least reasonably, imply the preclusion of alternatives'" (citations omitted)).

Yet context is critical, and a careful look at the structure of both the statute and the regulation counsels against implying an "only" as sometimes can and should be done pursuant to the *expressio unius* canon. To do so, we think, would cut against the thrust of 9 DCMR § 408 as a whole. Section 408 begins with the preface: "In addition to the provisions of the Act (D.C. Code § 47-2001 (p)(2)), the term 'sales price,' as used in the Act, shall not include any of the exceptions set forth in this section." 9 DCMR § 408.1. Significantly, § 47-2001 (p)(2) lists

things that are *not* included in the term "sales price," one of which is "[t]he amount of reimbursement of tax paid by the purchaser to the vendor under this chapter." And each of the substantive provisions of 9 DCMR § 408 includes the matching language "shall not be subject to the tax," which further suggests that the point of this regulation is to add to the list of exclusions found in the statute. *See* 9 DCMR § 408.1-4. Section 408 essentially says that, in addition to the § 47-2001 (p)(2) exclusions, here are more exclusions. The District's reading seems to be that, because one of the exceptions in the regulation's list of "more exceptions" can—by implying the word "only"—be read as narrower than the corresponding exception in the statute's list of "original exceptions," then the "original exceptions" list has actually been eroded. While there is no rule against including cross-cutting provisions in the same section of a regulation—and there would be nothing wrong with the District's current tax authority, the Office of Tax and Revenue (OTR), providing a clarification that narrows one of the 47-2001 (p)(2) exclusions, if it chose to—we think that 9 DCMR § 408.2 would be a cryptic way of expressing an intention to narrow. We are unwilling to read a regulation purportedly meant to broaden the § 47-2001 (p)(2) exclusions as actually constricting § 47-2001 (p)(2)(D).[7]

---

[7] The District also claims that its interpretation of the regulation is entitled to deference, and cites several cases for the entirely true propositions that an

(continued…)

The District also suggests that the tax reimbursement amounts collected by the OTCs are not "reimbursements" at all, because the word "reimbursement" implies the customer's knowledge of the amount at issue. The District writes: "[T]he OTCs' position . . . that the customer pays an amount as tax reimbursement even if he does so unwittingly because the vendor remits that amount to the government later . . . is not in any normal sense tax 'reimbursement.'" For several reasons, we cannot agree. First, we have here a sum of money collected from the customer to make up for the amount remitted to the District as sales tax. In our

---

(…continued)
agency's interpretation of its own regulation is controlling unless plainly erroneous or inconsistent with the regulation, *see Auer v. Robbins*, 519 U.S. 452, 461 (1997), and that when an administrative agency such as OTR interprets a relevant statutory provision in a regulation, that interpretation merits "great deference." *See Loney v. District of Columbia Rental Hous. Comm'n*, 11 A.3d 753, 755-56 (D.C. 2010). In this case, however, we do not perceive an agency's interpretation that merits our deference. Rather, it appears that the District discovered this regulation from 1954 part way through the litigation and now argues that its reading of that regulation represents the expert agency's opinion on this case. As far as we can tell from the record, however, the only hint of how the District tax authorities view the § 47-2001 (p)(2)(D) exclusion is expressed in the language of the regulation, and—for the reasons just discussed—we do not read that regulation to say what the District wants it to say. That makes this case different from *Auer*, where the Supreme Court held that judicial deference was due to the *Secretary of Labor's* interpretation of a regulation, notwithstanding that the Secretary had articulated that interpretation in a legal brief. *See Auer*, 519 U.S. at 462. Because the District's interpretation appears to come from the Solicitor General's office rather than from the administrative agency to whose expertise we defer, "the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *See id*.

view, that description is sufficient to make it a tax reimbursement in the normal sense. Next, even assuming that it makes sense to look into the mind of the customer when determining whether an amount that the vendor collects from the customer and remits to the District counts as a "reimbursement," the customer *did* know there was a reimbursement being paid here. As the trial court concluded, there was something called a "tax recovery charge"; the problem was that the "tax recovery charge" included a built-in service fee and therefore the sales tax reimbursement was not "stated separately." As the trial court also concluded, that built-in service fee made the reimbursement noncompliant, but the reimbursement's noncompliance did not turn it into something other than a reimbursement. Rather, it was just that: a noncompliant *reimbursement*. And reimbursements are expressly excluded from the definition of "sales price" by § 47-2001 (p)(2)(D).

The trial court found that the OTCs "substantially complied" with the separate statement requirement, then, and the District's counterargument relies on a sort of all-or-nothing logic we cannot accept. Granted, there does not appear to be a bright line between a noncompliant reimbursement and something that is not a reimbursement at all. By the District's logic, though, a tax reimbursement amount that was understated by fifty cents, for example, would seem to be not merely

noncompliant, but something other than a reimbursement "under this chapter." In that example, much like this case, the customer would lack exact knowledge of the amount of reimbursement she has paid, but it is still farfetched to say that the reimbursement would therefore not be a reimbursement "under this chapter."

As the District correctly points out, there is no general rule that substantial compliance is good enough when it comes to the formalistic and often technical requirements of the tax code, *see Kleiboemer v. District of Columbia*, 458 A.2d 731, 734 & n.4 (D.C. 1983), and there is also a general canon of construction directing that tax exemptions be narrowly construed. *See, e.g., Antietam Hotel Corp. v. Comm'r of Internal Revenue*, 123 F.2d 274, 278 (4th Cir. 1941). These are both valid considerations, and we note that we do not read the trial court as creating a new doctrine or general rule of tax law. But at the end of the day, general maxims are not going to decide this specific question of statutory interpretation. In particular, this case asks us to decide between two meanings of the phrase "under this chapter," and the choice appears to be between what we view as its ordinary use, meaning "under this chapter, as opposed to another" (or simply "here"), and an unusual use, meaning "in accordance with every provision of this chapter." We choose the former.

The District also makes a number of policy arguments, emphasizing that

Congress focuses on the consumer's perspective when passing sales tax laws because the consumer might need the separately stated sales tax information to comply with his or her own tax obligations, and that Congress strives for consumer protection (noting that, elsewhere in the sales tax law, Congress made it a criminal offense for vendors to assure customers that the vendors will absorb the District sales tax). Some of these arguments justify the separate statement requirement, but they are not reasons to change the definition of "sales price" adopted by the tax code. Ultimately, many of these arguments rely on the logic that, since the OTCs were culpable in not complying with the separate statement requirement, then they do not "deserve" the § 47-2001 (p)(2)(D) exclusion. But § 47-2001 (p)(2)(D) excludes sales tax reimbursement amounts from the definition of "sales price," and the remedy for the failure to comply with a given provision of the tax code is not necessarily greater taxation.[8] The trial court therefore correctly reasoned:

---

[8] While the District argues that, according to the reading we adopt today, there is no consequence for the OTCs' failure to state the tax reimbursement amount separately, the District has not shown the inadequacy of injunctive relief. In fact, enjoining the OTCs from failing to state the sales tax separately was exactly the relief the District sought at the beginning of this litigation. Indeed, it seems that injunctive relief is proper here because—putting aside the District's reading in which the § 47-2001 (p)(2)(D) exclusion is an exemption that the OTCs "earn" when they state the reimbursement amounts separately and "forfeit" when they do not—it is undisputed that the District has been receiving the right amount of tax due on the hotel's net rate had the reimbursement amounts been stated separately. As far as tax on the net rate, then, the District has been receiving the correct amount, though a stricture of the sales tax law has not been complied with.

(continued…)

"Nowhere does the statute provide that if the tax amount is collected, but not stated separately, the tax amount is subject to additional taxation. Accordingly, the plain language reading of this section provides no basis for the District's contention that the tax recovery charge should be included in the calculation of the 'sales price.'" We affirm the trial court's grant of summary judgment to the OTCs on this point.

## VI. Conclusion

For the reasons in this opinion, we affirm the judgment of the Superior Court.

*So ordered.*

---

(…continued)

Therefore, the natural relief is for the District to keep that amount and to get an injunction to ensure that the stricture be complied with. That is the relief the District sought, after all. By way of analogy, if one owes tax of $100 that must be remitted in a red envelope, but one remits $100 in a blue envelope, the District is not entitled to more than $100, only an order that one stop using the blue envelope. In arguing otherwise, the District points out that the OTCs' failure to make a separate statement worked "to the detriment" of their customers and so there must be some consequence for that. Not only is this sort of punitive taxation not provided for in the text of the sales tax law, however, but it is also not clear how the OTCs' payment of more money to the District is going to somehow make those customers whole.

MCLEESE, *Associate Judge*, concurring in part and dissenting in part: I agree with the court that the online travel companies (OTCs) are subject to sales tax in the District of Columbia, and I join Parts I through IV of the court's opinion. I respectfully dissent, however, from the court's holding in Part V of the opinion that the OTCs are not liable for sales tax based on the full amount the OTCs charged purchasers.

**I.**

Under the applicable provisions, vendors are required to pay a tax based on their gross sales receipts. D.C. Code § 47-2002 (a) (2012 Repl.). To the extent possible, vendors must obtain reimbursement for that tax from purchasers. D.C. Code § 47-2003 (a) (2012 Repl.). Gross receipts are defined in terms of sales price, and the sales price does not include tax-reimbursement amounts "paid by the purchaser to the vendor under this chapter [i.e., the chapter applicable to gross sales tax]." D.C. Code §§ 47-2001 (h), -2001 (p)(D)(2) (2012 Repl.). Vendors are required to charge purchasers separately for the tax reimbursement, and that charge must be separately stated on any receipt at the time of sale. D.C. Code § 47-2009 (2012 Repl.). By long-standing regulation, "[t]he amount of reimbursement of taxes paid by the purchaser to the vendor under the Act shall not be subject to the tax if the reimbursement amount is stated separately from the sales price." 9

DCMR § 408.2 (2015).

The OTCs did not comply with the statutory requirement that vendors separately charge purchasers for tax reimbursement, instead imposing a single charge that referred to taxes and fees without indicating the exact amount of either. The District of Columbia contends that the OTCs therefore did not obtain proper tax reimbursement and thus are liable for sales tax based on the entire amount the OTCs charged purchasers. In my view, the District's interpretation of the applicable provisions is reasonable and entitled to deference from this court. *See, e.g.*, *Auer v. Robbins*, 519 U.S. 452, 461-62 (1997) (agency's interpretation of its own regulations is controlling unless "plainly erroneous or inconsistent with the regulation"; although agency's interpretation was advanced in legal brief, that did not undermine deference, where there was "no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question") (internal quotation marks omitted); *District of Columbia Dep't of Env't v. East Capitol Exxon*, 64 A.3d 878, 880-81 (D.C. 2013) ("It is well established that this court affords deference to an agency's interpretation of the statute and regulations it is charged by the legislature to administer, unless its interpretation is unreasonable or is inconsistent with the statutory language or purpose. This deference stems from the agency's presumed expertise in construing

the statute it administers. When, as here, the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.") (citations and internal quotation marks omitted).

The court does not explicitly address whether the District's interpretation of the applicable statutory provisions is entitled to deference or whether 9 DCMR § 408.2 should be upheld as long as the regulation reflects a reasonable interpretation of the applicable statutory provisions. The court does conclude, however, that the District's interpretation of § 408.2 is not entitled to deference, because that interpretation was not advanced at the outset of this litigation and is presented in a brief filed in this court by the Office of the Solicitor General. The Supreme Court has explained, however, that "*Auer* ordinarily calls for deference to an agency's interpretation of its own ambiguous regulation, even when that interpretation is advanced in a legal brief . . . ." *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2159 (2012). The District relied on the regulation in summary-judgment pleadings filed by the Office of the Attorney General, and I see no reason to doubt that the Office of the Attorney General and the Office of the Solicitor General are fairly presenting the agency's interpretation of § 408.2.

In granting summary judgment in December 2012, the trial court ruled that

the District waived this argument in a discovery response filed in February 2012. In opposing summary judgment in May 2012, however, the District clarified that it in fact was seeking to recover sales tax based on the full amount the OTCs charged purchasers, without any reduction for purported tax reimbursement. In the absence of any finding that the OTCs were prejudiced, I would not treat the argument as irretrievably lost based on a statement in a discovery response that was clarified before the trial court ruled on the summary-judgment motion. *Cf., e.g.*, *Brooks v. United States*, 993 A.2d 1090, 1095 (D.C. 2010) (when exercising discretion in considering whether to grant request to withdraw prior waiver or stipulation, trial court may consider "various factors, including the stage of the proceedings, the importance of the testimony, inconvenience to the court, and prejudice to the [opposing party]"); *Marshall v. District of Columbia*, 391 A.2d 1374, 1378-79 (D.C. 1978) (trial court did not abuse discretion in permitting District to withdraw prior admission by default, given absence of prejudice to opposing party); *Schrier v. Home Indem. Co.*, 273 A.2d 248, 251 (D.C. 1971) (reversing where trial court treated ambiguous language in stipulation as waiving defense).

On the merits, I agree with the District that 9 DCMR § 408.2 is better understood to mean that, unless the amount of tax reimbursement is stated separately from the sales price, vendors are not entitled to a reduction in tax based

on a claim that some of the price to the purchaser was actually tax reimbursement. Two distinct canons of construction support this understanding of § 408.2. The first canon is "*expressio unius est exclusio alterius*, which embodies the common-sense principle that when a legislature makes express mention of one thing, the exclusion of others is implied." *Odeniran v. Hanley Wood, LLC*, 985 A.2d 421, 427 (D.C. 2009) (internal quotation marks omitted). By expressly identifying only one circumstance in which vendors are entitled to a reduction for tax reimbursement, § 408.2 naturally tends to imply that vendors otherwise are not entitled to a reduction. "Although the *expressio unius* maxim must be applied with a considerable measure of caution, it is useful where the context shows that the draft[ers'] mention of one thing does really necessarily, or at least reasonably, imply the preclusion of alternatives." *Id.* (citation, ellipses, and internal quotation marks omitted). This seems to me such a case, particularly because, as the court acknowledges, a contrary reading of § 408.2 contradicts the "cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *Virginia v. Maryland*, 540 U.S. 56, 74 (2003) (internal quotation marks omitted). *See, e.g.*, *Consumer Action Network v. Tielman*, 49 A.3d 1208, 1213 (D.C. 2012) ("A basic principle is that each provision of the regulation should be construed so as to give effect to all of the regulation's provisions, not

rendering any provision superfluous.") (brackets and internal quotation marks omitted). The applicable statutes already provide that vendors are entitled to a reduction for separately stated tax reimbursement. D.C. Code §§ 47-2001 (h), -2001 (p)(D)(2), -2009. Interpreting § 408.2 as simply reiterating that point renders the regulation entirely superfluous.

Moreover, if 9 DCMR § 408.2 imposes no limits on the ability of vendors to obtain a reduction for tax reimbursement, then the words "if the reimbursement amount is stated separately from the sales price" are entirely superfluous relative to the rest of the regulation, because the rest of the regulation already provides generally that vendors are entitled to a reduction for tax reimbursement. Under the court's view, therefore, the pertinent language in § 408.2 is doubly pointless. In comparable circumstances, other courts have interpreted the word "if" to be mandatory rather than permissive. *See, e.g.*, *United States v. Leichtnam*, 948 F.2d 370, 373 (7th Cir. 1991) (under statute permitting officers to enter house to execute search warrant if officers are refused admittance after announcing authority and purpose, "the word 'if' in the statute means 'only if'"); *Perkinelmer, Inc. v. Intema Ltd.*, Civ. Act. Nos. 09cv10176-NG, etc., 2010 WL 2682423, *11-12 (D. Mass. July 2, 2010) (holding that, in context of patent claim at issue, "if" means "only if"), *aff'd in part and rev'd in part*, 496 F. App'x 65 (Fed. Cir. 2012); *see generally*

*Regal Fin. Co. v. Tex Star Motors, Inc.*, 355 S.W.3d 595, 600 (Tex. 2010) ("The word 'if' can hold different meanings in different contexts. It ordinarily describes a non-mandatory condition. The clearest expression of a mandatory condition is to say 'only if'. In some contexts, where only one option exists to satisfy the condition, 'if' can present a mandatory condition without being preceded by the word 'only'.") (footnotes omitted); *Northcutt v. McAllister*, 249 S.W. 398, 400 (Mo. 1923) ("'If' may be a small word, but all know its meaning, and instead of a more formal phrase it is used in common language to express condition or limitation . . . .") (internal quotation marks omitted).

The court concludes, however, that the foregoing considerations are inadequate, because interpreting 9 DCMR § 408.2 to impose a limitation "would cut against the thrust of . . . § 408 as a whole," which the court describes as adding to the statutory list of exceptions to "sales price." The principal difficulty with that conclusion is that § 408.2 is outside that thrust in any event, because even under the court's interpretation § 408.2 does not add to the statutory list of exceptions but instead pointlessly reiterates one statutory exception. Moreover, even if § 408.2 did point in a direction different from the other parts of § 408, that consideration would, in my view, be outweighed by the contrary considerations I have previously noted. In sum, § 408.2 provides for a reduction for tax reimbursement if the

amount of tax reimbursement is separately stated. I do not think that that provision can reasonably be interpreted to permit such a reduction even if the amount of tax reimbursement is not separately stated.

I also would conclude that, so construed, 9 DCMR § 408.2 is a reasonable interpretation of the applicable statutory provisions. Those provisions authorize a reduction for tax reimbursement and require that tax reimbursement be separately stated, but do not speak explicitly to what should happen if a vendor does not separately state the amount of tax reimbursement. D.C. Code §§ 47-2001 (h), -2001 (p)(D)(2), -2009. In essence, § 408.2 reflects the view that part of the purchaser's payment to the vendor can be treated as tax reimbursement by the purchaser only to the extent that it is documented at the time of the sale that the parties to the sale understood that a specified amount of the purchaser's payment was tax reimbursement rather than sales price. Both as a matter of ordinary language and as a matter of policy, that seems to me a natural and reasonable approach to determining what portion of a purchaser's payment is deemed to be tax reimbursement. With respect to ordinary language, it seems awkward to describe the OTCs' customers as having "reimburse[d]" the OTCs for the amount of the tax due, because the customers had no way of knowing what portion, if any, of their payment was treated by the OTCs as such reimbursement.

*Cf., e.g.*, *Bilyeu v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 287 P.3d 773, 774-77 (Wyo. 2012) (refusing to treat employer's per diem payment to employee as "reimburse[ment] for travel expenses," where representative of employer testified that payment was not reimbursement and there was "no evidence that anyone told [the employee] . . . what the payment was for").

With respect to policy, the District persuasively argues that the separate-statement requirement serves important purposes, including ensuring that both parties to a sale understand the amount of sales tax involved, which can determine other tax obligations of the parties. *See, e.g.*, D.C. Code § 47-2205 (purchaser liable for unreimbursed tax) (2012 Repl.); 26 C.F.R. § 1.164-5 (2015) (permitting federal tax deduction for state sales tax if amount of sales tax is separately stated). As interpreted by the District, the applicable provisions provide a salutary incentive to comply with the separate-statement requirement. Unsurprisingly, a number of other jurisdictions take the same substantive approach, refusing to permit vendors to reduce their tax based on purported tax reimbursement that was not separately stated at the time of the transaction. *See, e.g.*, *Saco Indus. v. Illinois Dep't of Revenue*, 702 N.E.2d 1012, 1014-15 (Ill. App. Ct. 1998) (imposing tax based on full amount of purchasers' payments, because vendor failed to separately state tax at time of transaction); *Noar Trucking, Inc. v. State Tax Comm'n*, 527

N.Y.S.2d 597, 599 (App. Div. 1988) (same, where vendor failed to separately state tax amount, instead simply stating that gross price included tax); *Rose v. Glander*, 91 N.E.2d 685, 685-86 (Ohio 1950) (per curiam) (if sales taxes separately stated, they are not included in sales price, "but if the [vendor] does not so separately state them they shall be included in the determination of the tax"). This jurisdiction takes the same substantive approach with respect to transportation charges, which by statute can be excluded from sales price for tax purposes only if separately stated. D.C. Code § 47-2001 (p)(2)(E). I recognize, as the court points out, that the presence of express language in the latter provision but not D.C. Code § 47-2001 (p)(2)(D) arguably provides some support for the OTCs' position. But I view that consideration as outweighed by the others I have mentioned, particularly given our obligation to defer to the District's interpretation of the relevant provisions as long as that interpretation is reasonable.

Finally, even assuming that the doctrine of substantial compliance is applicable in the present context, I do not view the OTCs' failure to provide any indication of the amount of reimbursement as constituting substantial compliance with the OTCs' statutory obligations. Nor do I view the imposition of a tax on the full amount of the customers' payments as an impermissible penalty.

In sum, I would hold that the OTCs are liable for tax based on the full

amount of their customers' payments, without reduction for purported tax reimbursement. I therefore respectfully dissent from the holding of Part V of the court's opinion affirming the contrary ruling of the trial court.